UNITED STATES OF AMERICA

IN THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| United States of America,<br>    Plaintiff, | File No. 1:18-cr-166 |
| v. | Hon. Paul L. Maloney<br>U.S. District Court Judge |
| Daniel Dario Trevino (D-1)<br>    Defendant. | |

_____/

**DEFENDANT DANIEL TREVINO'S (D-1) RESPONSE IN OPPOSITION TO GOVERNMENT'S MOTION IN LIMINE REGARDING MEDICAL MARIHUANA [R. 64, 65]**

Attachment 1 – *United States v. Walsh*, 654 Fed.Appx. 689 (6th Cir. 2016)

654 Fed.Appx. 689
This case was not selected for publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals, Sixth Circuit.

UNITED STATES of America, Plaintiff–Appellee,
v.
Phillip Joseph WALSH and Betty Lee Jenkins, Defendants–Appellants.

Nos. 15–1569/2071
|
FILED June 29, 2016

**Synopsis**
**Background:** After denial of motions to suppress evidence and issuance of in-limine order precluding co-defendants from introducing evidence regarding their compliance with Michigan's Medical Marihuana Act (MMMA), co-defendants were convicted by jury of one count of conspiracy to manufacture 100 or more marijuana plants and 11 counts of maintaining drug-involved premises, and they were sentenced, respectively, to 168-month prison term followed by five-year supervised release period, and 126-month prison term followed by four-year supervised release period, by the United States District Court for the Western District of Michigan. Defendants appealed.

**Holdings:** The Court of Appeals, Jane B. Stranch, Circuit Judge, held that:

exclusion of MMMA evidence did not deprive defendants of due process;

preclusion of defense counsel's closing arguments that could lead to jury nullification was not abuse of discretion;

conviction did not violate due process by alleged lack of notice of criminal conduct;

government did not engage in prosecutorial misconduct;

defendant did not invoke her right to counsel after *Miranda* warning;

defendant lacked standing to contest search of apartments that she owned; and

defendant's 126-month sentence was procedurally and substantively reasonable.

Affirmed.

**\*691** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN

**Attorneys and Law Firms**

Mark V. Courtade, Assistant U.S. Attorney, Jennifer L. McManus, Assistant U.S. Attorney, Office of the U.S. Attorney, Grand Rapids, MI, for Plaintiff–Appellee.

Michael J. Nichols, Nichols Law Firm, East Lansing, MI, Liisa R. Speaker, Speaker Law Firm, Lansing, MI, for Defendant–Appellant Phillip Joseph Walsh (Case No. 15–1569).

David Alan Dodge, Dodge & Dodge, Grand Rapids, MI, for Defendant–Appellant Betty Lee Jenkins (Case No. 15–2071).

BEFORE: KEITH, COOK, and STRANCH, Circuit Judges.

OPINION

JANE B. STRANCH, Circuit Judge.

Phillip Joseph Walsh and Betty Lee Jenkins appeal the final judgments against them on one count of conspiracy to manufacture 100 or more marijuana plants and eleven counts of maintaining drug-involved premises.[1] They raise several common claims on appeal, largely based on the district court's in-limine order precluding the defendants from introducing evidence regarding their compliance with Michigan's Medical Marihuana Act (MMMA). Jenkins also separately challenges the district court's denial of her motions to suppress statements and evidence collected during the search of her properties and challenges the reasonableness of her sentence. For the reasons set forth below, we AFFIRM the orders of the district court.

**\*692 I. BACKGROUND**

On November 6, 2013, a Kent County Sheriff's Department and Drug Enforcement Administration investigation of marijuana manufacturing operations involving Walsh, Jenkins, and others led to the search of several properties, including the residence that Walsh and Jenkins shared, two apartment buildings owned by Jenkins and rented out (the Gaines Street apartments), and additional properties.[2] In total, the search yielded more than 250 marijuana plants and more than 18 pounds of processed marijuana.

On April 22, 2014, a grand jury issued a twelve-count indictment including one count of conspiracy to manufacture 100 or more marijuana plants, 21 U.S.C. §§ 841, 846, and eleven counts of maintaining drug-involved premises, 21 U.S.C. § 856.[3] Five co-conspirators, Gregory A. Kuldanek, Kathleen Anne Rosengren, Cynthia Wessel, Steven Hawkins, and Parker Wilcoulter Smith, eventually pleaded guilty and entered into plea agreements with the United States.

Walsh and Jenkins elected to proceed to trial. A jury trial was held on January 5 to January 12, 2015.[4] According to the Government's theory of the case, Walsh and Jenkins were the organizers of a marijuana manufacturing scheme operated under a company owned by Jenkins, BL Boop Enterprises, LLC. The Government alleged at trial that Walsh and Jenkins recruited several co-conspirators, many of whom were in financial need and willing to assist in the cultivation of marijuana in exchange for free or reduced rent in the Gaines Street apartment buildings.

Walsh and Jenkins allegedly assisted their co-conspirators by building grow rooms, providing startup costs, and training them. The co-conspirators were registered as "caregivers" to grow and distribute marijuana under the MMMA. One of the co-conspirators, a physician, helped the operation to obtain patient cards, which he would sign for "patients" without conducting a physical examination or even meeting the patient.

The Government alleged that with the combined efforts of the co-conspirators, including Jenkins's son and son-in-law, the operation grew marijuana in six of the eight units located in the Gaines Street apartments, as well as an attached garage. Five of the eight apartments were used exclusively for the manufacture of marijuana. At some later point, Walsh and Jenkins began growing marijuana in additional locations, including a lake house owned by the physician supplying patient cards. The Government alleged at trial that the operation reached beyond Michigan customers to buyers in Ohio and on the East Coast.

After a six-day trial on the merits, the jury returned a guilty verdict against Walsh and Jenkins on all counts. On May 4, 2015, Walsh received a sentence of 168 months imprisonment, to be followed by a **\*693** five-year supervised release period. On August 31, 2015, Jenkins received a sentence of 126 months and a four-year period of supervised release. Walsh filed a notice of appeal on May 12, 2015, and Jenkins's notice of appeal followed on September 8, 2015.

## II. ANALYSIS

We begin with the claims raised by both Walsh and Jenkins. The first common claim asks whether the district court's motions-in-limine order deprived defendants of due process by precluding them from establishing a defense against federal marijuana charges, or at least allowing the jury to render a verdict based on "the full story." The second considers whether, in light of the district court's order, the Government committed prosecutorial misconduct by offering evidence of defendants' violations of the MMMA.

Next, we consider claims brought individually by Jenkins, who challenges the district courts orders dismissing her motions to suppress statements and evidence that she claims were collected in violation of the Fourth Amendment. Jenkins also disputes the reasonableness of her sentence.

### A. Claims Related to the District Court's In–Limine Order

Walsh and Jenkins contend that the district court's order precluding them from arguing or introducing evidence related to their compliance with Michigan medical marijuana laws violated their due process right to present a defense. In light of Section 538 of the 2015 Appropriations Act, they contend that compliance with state law provides immunity and an affirmative defense against federal marijuana charges. In evaluating the charges against them, Walsh and Jenkins assert that the jury should have considered whether their manufacture of marijuana conformed to the MMMA. They further contend that the Government failed to comply with the district court's in-limine order to such an extent that it constituted prosecutorial misconduct.

The Government responds that Walsh and Jenkins have waived these arguments, as they made no objection during trial and the arguments are raised for the first time on appeal. Even if they were not waived, the Government maintains, these claims afford no relief.

#### 1. Evidence Relating to Michigan's Medical Marihuana Act

A motion in limine is "made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered." *Luce v. United States*, 469 U.S. 38, 40 n.2, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). It is "designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013) (quoting *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1069 (3d Cir. 1990)).

The district court granted several of the Government's motions in limine, including motions to prevent Walsh and Jenkins from arguing or introducing evidence to suggest

(1) marijuana has medical value, (2) their erroneous belief that their conduct was lawful, or (3) compliance with state law. As for the last, the Government cited *People v. Redden*, 290 Mich.App. 65, 799 N.W.2d 184 (2010) (P.J. O'Connell, concurring), for the proposition that Michigan courts have "cautioned citizens and legal counsel not to rely upon the MMMA even for protection against criminal charges arising under state law." That concurring opinion advised that "[u]ntil our Supreme Court provides a final comprehensive interpretation of [the MMMA], it ***694** would be prudent for the citizens of this state to avoid all use of marijuana if they do not wish to risk violating state law." *Redden*, 799 N.W.2d at 204 n.10.

In considering these motions, the district court noted that while conspiracy is a specific intent crime, conspirators must only have the "specific, willful intent to enter into the agreement with others and achieve the objective of the conspiracy," in this case, growing marijuana. The Government need not show that Walsh and Jenkins "intended to willfully violate federal drug laws or knew that their actions violated the Controlled Substances Act." The district court determined that a good faith belief in the legality of the operation was therefore irrelevant and, while this ruling hindered the ability of the defense to paint a complete picture, "irrelevant evidence is never admissible." Concluding that "the only reason to discuss compliance with Michigan's medical marijuana laws [was] to encourage jury nullification or establish a defense that [was] not valid," the court granted the Government's motion on this subject.

*a. Standard of Review*

On appeal, Walsh and Jenkins argue that the district court's in-limine ruling necessitates de novo review because it is tied to a question of statutory interpretation: whether compliance with the MMMA affords an affirmative defense to federal marijuana charges in light of Section 538 of the 2015 Appropriations Act. The Government counters that the correct standard of review is plain error: Walsh did not file a response in opposition to the Government's motions in limine and, while matters of statutory interpretation are ordinarily reviewed de novo, arguments related to Section 538 were raised by Walsh and Jenkins for the first time on appeal. *See* Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."); *see also United States v. Cromer*, 389 F.3d 662, 672 (6th Cir. 2004) (employing plain error review of an argument first made on appeal, "even if the forfeited assignment of error is a constitutional error").

We disagree with both approaches. First, Walsh and Jenkins's challenge to the district court's order requires review of an evidentiary ruling, not an issue of statutory interpretation. Second, both arguments (opposing the motions in limine and raising an argument related to Section 538) were raised below by co-defendant Greene and by Jenkins in responses in opposition to the motions in limine, and by co-defendant Adam Paul Rumpf in a motion to dismiss the indictment on the basis of Section 538. A co-defendant's objection can preserve an issue on appeal. *See United States v. Baker*, 458 F.3d 513, 517–18 (6th Cir. 2006) (collecting cases that "emphasize the futility of requiring each defendant to raise a redundant objection" and reviewing for abuse of discretion rather than plain error when a defendant's objection "would not have served any purpose in light of the fact that the district court was made aware of the basis for the objection by [his] codefendant").

We therefore review the district court's ruling on the Government's motions in limine for abuse of discretion, determining whether the district court (1) relied on findings of fact that were clearly erroneous, (2) applied an incorrect legal standard, (3) misapplied a correct legal standard to reach a conclusion, or (4) made a clear error of judgment. *Louzon*, 718 F.3d at 560 (quoting *In re Countrywide Fin. Corp. Mortg. Lending Practices Litig.*, 708 F.3d 704, 707 (6th Cir. 2013)).

**\*695** *b. Analysis*

Marijuana is designated as a Schedule I drug by the federal Controlled Substances Act (CSA) due to its "high potential for abuse, lack of any accepted medical use, and absence of any accepted safety for use in medically supervised treatment." *Gonzales v. Raich*, 545 U.S. 1, 14, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005) (citing 21 U.S.C. §§ 812(b)(1) & (c)). By the terms of the Act, marijuana is "contraband for *any* purpose," and, "if there is any conflict between federal and state law" with regard to marijuana legislation, "federal law shall prevail" pursuant to the Supremacy Clause. *Id*. at 27, 29, 125 S.Ct. 2195.

The Supreme Court has further clarified that there is no medical necessity exception to the CSA prohibition on cultivation and distribution of marijuana. *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 486, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001). "Although state law may permit marijuana use for medicinal purposes under defined circumstances, federal law treats any possession, distribution, or manufacture of marijuana as a federal offense, and medical necessity is not a defense to a federal criminal prosecution for manufacturing or distributing marijuana." *United States v. Brown*, 801 F.3d 679, 693 (6th Cir. 2015) (citing *Oakland Cannabis Buyers' Coop.*, 532 U.S. at 493–94, 121 S.Ct. 1711). In *Gonzalez v. Raich*, the Supreme Court held that the CSA's prohibition of the manufacture and distribution of marijuana was a valid exercise of congressional power pursuant to the Commerce Clause. 545 U.S. at 29, 125 S.Ct. 2195. The commerce power is "superior to that of the States to provide for the welfare or necessities of their

inhabitants, however legitimate or dire those necessities may be." *Id*. (internal quotation marks omitted).

This precedent proved fatal as applied to a case similar to the one now before us, where defendants challenged their federal conviction for manufacturing more than 100 marijuana plants on the basis that the CSA was "unconstitutional as applied to caregivers operating in compliance with the MMMA." *United States v. Marcinkewciz*, 543 Fed.Appx. 513, 516 (6th Cir. 2013). There, we determined that defendants had offered no way to distinguish their arguments from those rejected by the Supreme Court, and we held them foreclosed by *Raich*. *Id*.

Walsh and Jenkins contend that Section 538 of the 2015 Appropriations Act changed the legal landscape in which *Raich* was decided. In support, Walsh cites *United States v. Marin Alliance for Medical Marijuana*, a civil case from the Northern District of California that interpreted Section 538 to preclude enforcement of a permanent injunction prohibiting distribution of medical marijuana by a dispensary to the extent that it complied with California law. No. C 98–00086 CRB, 2015 WL 6123062, at *6 (N.D. Cal. Oct. 19, 2015).

Section 538 states in relevant part:

> None of the funds made available in this Act to the Department of Justice may be used, with respect to the [states with medical marijuana laws, including California and Michigan] to prevent such States from implementing their own State laws that authorize the use, distribution, possession, or cultivation of medical marijuana.

Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113–235, § 538, 128 Stat. 2130 (2014) (extended until Dec. 11, 2015, by the 2016 Appropriations Act, Pub. L. No. 114–53, § 103, 129 Stat. 502 (2015)). After considering this plain language, and the relevant legislative history, the *Marin Alliance* court interpreted *696 Section 538 to provide an exception to the rule that state law offers no defense to violations of federal marijuana law. The court acknowledged that "[t]he CSA remains in place" and committed to "enforce it to the full extent that Congress has allowed in Section 538, that is, with regard to any medical marijuana not in full compliance with 'State law [ ] that authorize[s] the use, distribution, possession, or cultivation of medical marijuana.'" *Marin All.*, 2015 WL 6123062, at *4 (citing 2015 Appropriations Act § 538) (alterations in original).

Walsh and Jenkins argue that Section 538 changed the legal environment surrounding medical marijuana, by "prohibit[ing] the Government from prosecuting individuals who are acting in accordance with their state's medical marijuana laws." Therefore, they conclude, the district court "violated Defendant's due process right to present a defense" by granting the relevant motion in limine, and by failing to "reconsider its decision in light of the enactment of Section 538," which deprived them of the opportunity to establish immunity[5] or an affirmative defense[6] under the MMMA.

We cannot conclude that the district court abused its discretion by precluding evidence of compliance with Michigan medical marijuana laws. Though the legal treatment of marijuana, both medical and recreational, has continued to change in the ten years since *Gonzalez* was decided, it remains good law. The district court granted the motions in limine on the basis that the manufacture and distribution of Schedule I drugs, including marijuana, is prohibited under the terms of the CSA. The district court explained that satisfaction of state law is not a defense to breaching federal law; thus, compliance with Michigan law is irrelevant when considering a defendant's guilt or innocence under federal law.

Section 538 did not render this legal standard incorrect. While, by its terms, Section 538 instructs the Department of Justice on where to spend its funds with respect to marijuana cultivation and distribution, it was not an abuse of discretion to determine that Section 538 did not require the court to halt or alter this criminal prosecution in its final stages. The district court's failure to reconsider its order regarding the Government's motions in limine on the basis of Section 538, when the 2015 Appropriations Act came into effect just weeks before the trial and no party raised the matter at trial, is not a clear error of judgment. *See Louzon*, 718 F.3d at 560.

*c. In–Limine Ruling Regarding Jury Nullification*

The district court also granted the Government's motion in limine to preclude Walsh and Jenkins from arguing or presenting *697 evidence on topics that would lead to jury nullification, specifically: "(1) the debate about legalization of marijuana, (2) the medical benefits of marijuana use, (3) whether marijuana should be classified as a Schedule I substance, or (4) whether the federal government should be prosecuting crimes when citizens voted to allow marijuana use."

The issue arose when Walsh's counsel stated to the jury,

> [No one] can tell you what verdict to return. That is your decision. You get to write the final chapter to this book. You get to tell us how this story ends. That is your decision. You have that power.... When [the Framers] signed the Declaration of

> Independence, it was an act of treason. Today we view that act as heroic and courageous, and that provided us with many of the rights we take for granted.

R. 466, PageID 5284–85. This prompted an objection by the Government and a side bar in which the district court warned Walsh's attorney that he was "[r]eal close to jury nullification." Walsh's attorney explained that he was speaking to the burden of proof, not jury nullification, and proceeded without the district court ruling on the objection. He concluded with a request to the jury to remember that "history changes," and suggested that each juror ask "what side of history do you want to be on?"

Walsh argues that he should have been given "more latitude in his arguments" because the Sixth Circuit " 'allow[s] a defense attorney some leeway in persuading the jury to acquit out of considerations of mercy or obedience to a higher law.' " (Walsh Appellant Br. at 53) (citing *United States v. Burkhart*, 501 F.2d 993, 997 n.3 (6th Cir. 1974)). That admonition, however, is framed by recognition of the need for "impartial determination of justice based on law." *United States v. Krzyske*, 836 F.2d 1013, 1021 (6th Cir. 1988) (affirming the district court's refusal to give an instruction to the jury on nullification).

Walsh's argument that the ruling deprived him of "leeway" is unpersuasive under the facts here. The matter arose only once at a side bar during defense counsel's closing argument, after which, Walsh's attorney successfully concluded his closing argument in a very similar tone to that which had precipitated the Government's objection. Given the exceedingly minor nature of this incident, which took place out of the hearing of the jury and did not result in a ruling, we cannot conclude that the district court committed an abuse of discretion.

### d. Lack of Clarity on the State of Marijuana Law

Finally, we consider a related argument made by Jenkins individually. She argues that, in light of Section 538 and the MMMA, she had "no clear notice as to what conduct will cause the federal government to charge under federal law," making her conviction a due process violation. She likens her situation to that considered in *Morissette v. United States*, and similar cases. 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). In *Morissette*, the Supreme Court held that criminal intent was an essential element of the particular offense charged and that, because the defendant was unaware that the items he took were government property and not abandoned waste, he lacked the intent required for "knowing conversion." *Id.* at 274–76, 72 S.Ct. 240.

This case bears little resemblance to *Morissette*. As explained, while conspiracy is a specific intent crime, the specific intent required to support a conviction is the intent to achieve the objective of the conspiracy—here, to manufacture 100 or more **\*698** marijuana plants. *See United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir. 1999). The Government was not required to show that Jenkins knew of, or intended to violate, federal drug laws. "[T]he Supreme Court has identified only a few areas, such as tax law, where ignorance of the law is a defense, and that is because the tax system is so complex." *United States v. Roth*, 628 F.3d 827, 835 (6th Cir. 2011) (internal quotation marks omitted). The CSA is not such a "highly technical statute[ ]," and presents little to no "danger of ensnaring individuals engaged in apparently innocent conduct." *Bryan v. United States*, 524 U.S. 184, 194–95, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998). Jenkins's argument regarding her purported ignorance of the law is unavailing.

### 2. Prosecutorial Misconduct

Walsh and Jenkins contend that the Government engaged in prosecutorial misconduct when it "repeatedly referred to [their] alleged failure to comply with the [MMMA], despite the District Court's order that the [MMMA] and compliance or failure to comply with it was irrelevant and inadmissible." Walsh notes that the Government's alleged misconduct was not isolated—the Government raised the issue repeatedly throughout the trial, introducing co-defendants' plea agreements containing the "irrelevant stipulation[ ]" that each had violated the MMMA, questioning co-defendants to elicit precluded testimony, and including such remarks in closing argument.

The Government responds that it relied on the district court's evidentiary rulings, which precluded *defendants* from arguing they *complied* with Michigan law, along with Walsh's failure to object, and his "outright concurrence in the admission of the testimony." While, the Government admits "the trial was replete with evidence from which one could reasonably conclude that Walsh was violating Michigan law in many respects," it maintains that no witness was ever asked whether Walsh himself violated state law.

### a. Standard of Review

Whether a prosecutor's statements at trial amount to misconduct, and whether the statements render a trial fundamentally unfair, are "mixed questions of law and fact," which we generally review de novo. *United States v. Carson*, 560 F.3d 566, 574 (6th Cir. 2009). However, where a defendant fails to raise an objection below, we review such claims for plain error. *Id*. "Plain error review applies even if the forfeited assignment of error is a

constitutional error." *United States v. Collins*, 799 F.3d 554, 581 (6th Cir. 2015) (quoting *United States v. Cromer*, 389 F.3d 662, 672 (6th Cir. 2004)), *cert. denied*, ––– U.S. ––––, 136 S.Ct. 601, 193 L.Ed.2d 480 (2015).

To establish plain error, Walsh and Jenkins must show an error that was obvious or clear, affected their substantial rights, and that the adverse impact of the error "seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Carson*, 560 F.3d at 574 (internal quotation marks omitted). To determine whether the alleged prosecutorial misconduct affected Walsh and Jenkins's substantial rights, this court looks to four "flagrancy" factors: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." *Id.* (citing *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001)).

*699 *b. Analysis*

The record reveals that neither party's portrayal of this issue is particularly accurate. The text of the in-limine order does not bar the parties from introducing evidence that the marijuana manufacturing operation violated the MMMA. And all parties acknowledged that the issue of medical marijuana necessarily had some role to play in the jury trial. During discussions of the proposed preliminary instructions, even before voir dire, the district court heard argument from the parties concerning the relevancy of the MMMA to the proceedings. Counsel for Jenkins noted upon review of the Government's proposed jury instructions that, "[t]hey got the order prohibiting [defendants] from essentially mentioning or arguing or eliciting facts on medical marijuana," but that the Government's proposed jury instructions constituted in part a "dissertation on medical marijuana." Walsh's attorney agreed that since, "in federal court, federal law applies," making reference to medical marijuana made the issue "relevant and somewhat confusing."

In light of these concerns, the district court indicated that this matter was separate from the evidence it had barred defendants from introducing in the in-limine order and agreed with the Government that the subject matter of medical marijuana should be addressed given that the case involved federal marijuana charges in a state well known to have medical marijuana laws. The court explained to the parties that it would present the preliminary instructions to try to make clear to the jury that compliance with the MMMA does not provide a defense to the federal charges. The court noted that the parties could raise the subject again if they felt the instructions should be presented differently. Defense counsel offered no objection.

As initially anticipated, the issue of medical marijuana surfaced a number of times throughout the trial, but not exclusively due to the Government's lines of questioning. It was first raised by a Government witness and co-defendant, Kathleen Anne Rosengren.[7] In Rosengren's direct examination, she noted that her initial communications with Walsh and Jenkins prompted her to educate herself about medical marijuana. The Government went on to ask the following:

Q. What were you attempting to grow?

A. Medical marijuana.

Q. What did they tell you you were growing?

A. Medical marijuana.

R. 446, PageID 3328–29. Throughout direct examination, defense counsel objected to questions on other grounds, but never asserted that the Government was violating the in-limine order.

In cross-examination, Jenkins's counsel also raised questions relating to medical marijuana by asking whether Rosengren had recruited her own medical marijuana patients even though she had no medical marijuana to give them. She replied yes, she understood they could go to Walsh and *700 Jenkins. The Government did not object, and followed up on re-direct examination by continuing this line of questioning on medical marijuana patients. Defense counsel neither objected to this line of questioning nor sought to refute the Government's questions on re-direct on the basis that the door had been opened. In fact, Jenkins's attorney raised the issue only in the context of asking the court if *he* had gone too far into material stipulated to in the motion-in-limine order.[8] The district court replied that, "there weren't any objections from the [G]overnment," and "because the [G]overnment asked for the order, the [G]overnment has the order, they can protect the order by objecting to questions they think violate the order."

We have located but one instance in the trial transcript where defense counsel communicated any critique that the Government's argument might violate the motion-in-limine order. After Cynthia Wessel testified, Jenkins's counsel noted his concern, out of the presence of the jury, that the Government was creating the impression that Walsh and Jenkins violated the MMMA, "which is irrelevant by virtue of the order that [the Government] got in limine as well as the rulings that the Court has already relied on to indicate that we can't use it as a defense." However, counsel refrained from "asking for any specific relief," and instead sought "some guidance from the Court to the Government's attorneys as to the potential for jury confusion that's being created based upon the orders." The district court noted that it had not "heard anything from either defendant indicating they are objecting to the references," but reminded the parties that "the more we can

stay away from [the MMMA], the better."

This record does not support the assertion that Walsh and Jenkins were totally barred from introducing argument in any way related to medical marijuana, while the Government was allowed to do so fully.

The Government's actions at trial do not rise to the level of prosecutorial misconduct, particularly in light of the limiting instructions given to the jury, which reiterated that "[s]tate laws related to the legality of marijuana in certain circumstances have no bearing on the issues before you and provide no defense to any charge against the ... defendants," such that without instruction to the contrary, the jury "should not consider any reference to the medical use of marijuana." Our review of the trial transcript indicates that both parties acknowledged—either in statements to the court or through their questions to witnesses—that reference to medical marijuana may need to be introduced in the context of these charges, and that it could be done without running afoul of the in-limine order.

Walsh and Jenkins also challenge the Government's questions regarding co-defendants' plea agreement proffers insofar as they raised the issue of medical marijuana law. For example, Rosengren confirmed on the stand that her plea agreement included a stipulation that the MMMA would not protect her even if she had been in compliance with it. She also agreed that neither she, "nor any of the people [she] w[as] charged with were actually in compliance with the [MMMA]." Defense counsel never objected to entry of this or the other plea agreements.

While the guilty plea of a co-defendant cannot be offered as "substantive evidence of a codefendant's guilt," it may "properly be considered as evidence of a witness' credibility." *United States v. Thornton*, 609 F.3d 373, 377 (6th Cir. 2010) **\*701** (internal quotation marks omitted). Here, we are hard pressed to see how Rosengren's own stipulations regarding her co-defendants' violation of the MMMA is at all relevant to her credibility. That said, violation of the MMMA does not go precisely to the content of the in-limine order and, in absence of an objection to preserve this issue on appeal, we cannot say it rises to the level of plain error.

Because the Government's conduct did not seriously affect the fairness and integrity of the proceedings against Walsh and Jenkins, they cannot prevail on their claim of prosecutorial misconduct.

*c. Ineffective Assistance*

Walsh adds a claim that his counsel at trial was ineffective for failing to object to the introduction of evidence that he had not complied with Michigan law. "[A] motion under 28 U.S.C. § 2255 is generally the preferred mode for raising a claim of ineffective assistance of counsel" for a criminal defendant in federal custody. *United States v. Ferguson*, 669 F.3d 756, 762 (6th Cir. 2012) (citing *Massaro v. United States*, 538 U.S. 500, 504, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003)). This allows the ineffective assistance claim to be examined in the first instance by the district court, which is the "forum best suited to developing the facts necessary to determining the adequacy of representation during an entire trial," because it can "take testimony from witnesses ... and from the counsel alleged to have rendered the deficient performance." *Massaro*, 538 U.S. at 505–06, 123 S.Ct. 1690. We decline to consider the merits of Walsh's claim on direct appeal, as the record has not been sufficiently developed and agree with the Supreme Court's guidance in *Massaro* that, on these facts, the claim is properly raised in post-conviction proceedings. *See United States v. Bradley*, 400 F.3d 459, 461–62 (6th Cir. 2005) (observing the scant information available on the record regarding the conduct of defendant's trial counsel and instructing that a claim of ineffective assistance should be brought in a § 2255 motion).

### B. Jenkins's Individual Claims

Separately from the claims in which she joins with Walsh, Jenkins challenges the district court's denial of two motions to suppress filed before trial. She also challenges the reasonableness of her within-Guidelines sentence.

1. Motion to Suppress Jenkins's Statements during Search

When considering the denial of a motion to suppress evidence, we review the district court's findings of fact for clear error and its conclusions of law de novo. *United States v. Gunter*, 551 F.3d 472, 479 (6th Cir. 2009). The district court's determinations of fact are clearly erroneous when the reviewing court "is left with the definite and firm conviction that a mistake has been committed." *United States v. Ray*, 803 F.3d 244, 265 (6th Cir. 2015) (quoting *United States v. Navarro–Camacho*, 186 F.3d 701, 705 (6th Cir. 1999)). We defer to assessments of credibility made by the district court, *United States v. Adams*, 583 F.3d 457, 464 n.7 (6th Cir. 2009), and, as the motion to suppress was denied below, review the evidence in the light most favorable to the Government, *Gunter*, 551 F.3d at 479.

Prior to trial, Jenkins filed a motion to suppress statements that she made during the search of her residence on November 6, 2013, when, she alleges, she was questioned while in law enforcement custody before being advised of her *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1996). Jenkins further claimed that her repeated **\*702** requests for an attorney were ignored and questioning continued. Jenkins argued that these statements were subsequently used by law

enforcement to obtain additional search warrants for the Gaines Street apartments, which she also challenged.

An evidentiary hearing was held at which Jenkins testified that she was questioned for up to an hour before receiving a *Miranda* warning. Three detectives present during the interview testified that a *Miranda* card was read to Jenkins prior to questioning. The parties also disagreed with regard to Jenkins's invocation of her right to counsel. She claimed to have asked repeatedly to see a lawyer to no avail. The detectives, on the other hand, recalled that Jenkins asked "if she should have an attorney," to which the officer interviewing her replied that he could not advise her on the matter.

To sort through this conflicting testimony, the district court examined the record evidence and made a credibility determination, finding that Jenkins's "statements and demeanor on the stand all point to someone being untruthful," and that her testimony was "vastly outweighed" by the testimony offered by the Government. Though Jenkins had stated during the hearing that her house contained a surveillance system that recorded her asking the detectives to see a lawyer, she did not produce a copy to support her claim or her motion. One contemporaneously written record of the incident was available—a record of the interview created by the questioning detective less than a week after the incident. The report, read into evidence at the hearing by its author, who described it as "incredibly not accurate" in its portrayal of what happened, stated:

> I advised Jenkins of her rights from a card provided to me by [the Sherriff's Department]. Jenkins stated that she thought she should have a lawyer present before answering questions. I explained to Jenkins I was going to ask her questions, and if she did not feel comfortable answering any of my questions, to simply not answer them. Jenkins stated that she was okay with that, but was unable to sign the card due to being handcuffed behind her back.

R. 172, PageID 965. The district court placed "significant weight" on the report and noted it was "most consistent with Jenkins's version of the exchange."

Taking the record evidence and testimony on the whole, however, the district court concluded that Jenkins was read her *Miranda* warnings prior to questioning and thereafter posed a *question* as to whether " 'she should have a lawyer present before answering questions,' " rather than a "declarative statement." R. 196, PageID 1104. The court also noted that "[a]ll three officers interpreted" Jenkins's "reply as a question, rather than a declarative statement."

*Id*. The district court found it clear that Jenkins's statement was "interrogative in nature," rather than an unambiguous and unequivocal request for counsel that would require the detectives to halt the interview. *See Davis v. United States*, 512 U.S. 452, 459, 462, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (determining that the statement "maybe I should talk to a lawyer" is not a request for counsel and expressing unwillingness to "create a third layer of prophylaxis to prevent police questioning when the suspect *might* want a lawyer").

Jenkins further alleged that her waiver was involuntary because her handcuffs were too tight and the detective agreed to loosen them only if she answered his questions. The district court also found this claim was unsupported on the record and "entirely non credible." The court concluded that Jenkins had voluntarily waived her *Miranda* rights during questioning on November **\*703** 6, and denied her motion to suppress on this count.[9]

The standard of review governs the resolution of this issue as we must accept the court's findings of fact unless they are clearly erroneous. Here the district court determined that Jenkins was not credible and made a finding of fact that her reference to having a lawyer present with her before answering questions was "interrogative in nature." The court rejected Jenkins's claim that her statement was a declaration requesting counsel as opposed to a question. As noted above, we are to defer to credibility determinations and review findings of fact for clear error. *See Adams*, 583 F.3d at 468 (finding no clear error where the district court, faced with conflicting testimony, looked to the totality of the circumstances to deny defendant's motion to suppress a confession). Because the court denied the motion to suppress, "we review all evidence in the light most favorable to the Government." *Gunter*, 551 F.3d at 479. The case is close. Under the standard of review, however, we are not left with a definite and firm conviction that the district court erred in its factual finding that Jenkins's statement was interrogative. *See Ray*, 803 F.3d at 265. We defer to the district court's credibility assessments, finding that Jenkins was not credible and that the testimony of the three detectives was. Assuming, as we must in the absence of clear error, that Jenkins asked the interviewing officer whether she should get a lawyer, her question was not an "unequivocal invocation of the right to counsel" and, on the record as found by the court in this case, did not require that questioning cease. *See Machacek v. Hofbauer*, 213 F.3d 947, 950–53 (6th Cir. 2000) (finding objectively reasonable a state court's holding that defendant's legal guardian did not invoke the right to counsel when she remarked, "Should ... We're going to have to get a lawyer then and should his mother be notified?" and, when asked to clarify if she wanted an attorney present, "Well, what do you suggest? I've never been through this.").

### 2. Motion to Suppress the Search of the Gaines Street Apartments

Jenkins also challenges the district court's denial of a motion to suppress evidence seized from the Gaines Street apartments. Jenkins originally challenged this search on the basis that it was conducted without probable cause, absent a valid warrant, and without a valid exception to the warrant requirement. The district court conducted a hearing and found that Jenkins lacked standing to contest the search. The court held that Jenkins lacked a reasonable expectation of privacy under the Fourth Amendment with respect to these apartments because, although she owned them, she had leased them to others and they were largely used for commercial purposes.

Jenkins later filed a motion to reconsider based on "new evidence," specifically, the plea agreements of co-defendants Gregory Kuldanek and Cynthia Wessel, which stipulated that Jenkins had "maintain[ed] control over their ... marijuana growing operations including the right to enter and inspect, the right to obtain harvests, and a right of first refusal on subsequent harvests of marijuana." This high level of control, Jenkins argued, gave her standing to challenge "false and misleading **\*704** statements in the affidavits for the search warrants for the Gaines Street addresses."

The district court denied Jenkins's motion for reconsideration. The court found Jenkins's proffered evidence irrelevant because Kuldanek and Wessel lived in their own residences, not the Gaines Street apartments. The court declined to extrapolate from Jenkins's access to their homes any privacy interest in "apartments across town" when no evidence was offered to indicate that Kuldanek and Wessel lived or worked at the Gaines Street apartments. Moreover, even if the two co-defendants had resided in the Gaines Street apartments and agreed to Jenkins's unfettered access to their residences, the district court reasoned, Jenkins would still be unable to establish standing because Fourth Amendment protections do not generally extend to a person who is merely present in a house to pursue a business transaction.

The district court is correct that a landlord's ownership interest in a property does not, by itself, create a privacy interest when the property is rented to tenants. *See Shamaeizadeh v. Cunigan*, 338 F.3d 535, 544 (6th Cir. 2003) (observing that the Supreme Court has consistently held "privacy interests are not coterminous with one's property rights" and finding no privacy interest where a party owned a basement apartment but rented it out (citing *United States v. Salvucci*, 448 U.S. 83, 91, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980))). The fact that some of the Gaines Street apartments were uninhabited also does not lend support to Jenkins's subjective expectation of privacy.

While "the use of a space for illegal activity does not alter the privacy expectations of a person who would otherwise have standing," *United States v. Washington*, 573 F.3d 279, 283 (6th Cir. 2009), "[p]roperty used for commercial purposes is treated differently for Fourth Amendment purposes from residential property," *Minnesota v. Carter*, 525 U.S. 83, 90, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998). Jenkins failed to establish that she had a reasonable expectation of privacy in an apartment that she did not inhabit and, in fact, leased to others. *See id.* (finding individuals for whom the apartment was "simply a place to do business" did not have a reasonable expectation of privacy there).

### 3. Jenkins's Challenge to Her Within–Guidelines Sentence

We review the district court's sentencing determination for procedural and substantive reasonableness under a deferential abuse of discretion standard. *See United States v. Cochrane*, 702 F.3d 334, 343 (6th Cir. 2012). Where, as here, a defendant makes no objection to the procedural reasonableness of a sentence at the time it is imposed, we review for plain error.[10] *See United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc). Jenkins admits that her sentence of 126 months is presumptively reasonable as it falls within the Guidelines range of 121–151 months.[11] *See United States v. Simmons*, 587 F.3d 348, 365 (6th Cir. 2009) ("[W]e will not generally second guess sentences **\*705** on substantive grounds when they fall in the range prescribed by the Guidelines.") (internal quotation marks omitted). Here, we find no unreasonableness in the district court's reasoning, which properly took into account the 18 U.S.C. § 3553(a) factors, considerations specific to Jenkins including her low IQ and the manipulation by Walsh, and imposed a sentence on the low end of the Guidelines range.

On appeal, Jenkins points to the "relatively lenient" sentences received by her co-defendants to "put[ ] her sentence into context." But the comparators Jenkins proposes were her co-defendants who entered into plea agreements. More importantly, Jenkins was sentenced as an organizer of the conspiracy, a very different role from those co-defendants. Her sentence was significantly lower than that of Walsh, her fellow organizer who also went to trial and received a sentence of 168 months imprisonment.

Jenkins further attempts to bolster her challenge by reiterating arguments already made at sentencing, including offering a neuropsychological assessment report submitted with her motion for a downward variance to show her diminished intellectual functioning. Jenkins argues that while the district court "acknowledged," the report, it failed to explain "other than in a cursory manner" why a below-the-Guidelines sentence was not justified. But the district court did address the report and need not provide a lengthy explanation where a defendant's arguments are " 'straightforward [and] conceptually simple' and where a sentencing court imposes a within-

Guidelines sentence." *United States v. Duane*, 533 F.3d 441, 451 (6th Cir. 2008) (alteration in original) (quoting *Rita v. United States*, 551 U.S. 338, 356, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007)). We conclude that the district court did not abuse its discretion and that Jenkins's sentence is both procedurally and substantively reasonable.

### III. CONCLUSION

For the reasons stated above, we AFFIRM the final judgments against Walsh and Jenkins in their entirety.

---

Footnotes

1   Walsh and Jenkins were charged as co-conspirators (along with several others) and tried as co-defendants. On appeal, their cases were consolidated for the purposes of briefing and submission.

2   During the relevant period, Walsh and Jenkins were a couple. The exact nature of their relationship is unclear from the record. Walsh asserts they have a civil marriage and the Government refers to them as an unmarried couple.

3   Superseding indictments were returned in June and October 2014, which added defendants and premises involved in the operation.

4   Todd Stephen Greene was the third co-defendant to elect to proceed to trial. The Government subsequently voluntarily dismissed charges against him in August 2014 in exchange for his cooperation and based on his limited involvement in the operation. An additional co-defendant, Adam Paul Rumpf, initially chose to proceed to trial, but changed his plea in December 2014 to plead guilty to a reduced charge of one count of maintaining a drug involved premises.

5   To demonstrate immunity, which Walsh contends is a question of law, "a defendant must prove by a preponderance of the evidence that at the time of the charged offense the defendant possessed a valid registry card, no more medicine than allowed under section 4, that the plants were kept locked in an enclosed facility, and that the charged conduct was for medical use." (Walsh Appellant Br. at 23) (citing *People v. Hartwick*, 498 Mich. 192, 870 N.W.2d 37, 42 (2015)).

6   For cases that fall outside of the immunity parameters, Walsh argues that Section 8 of the MMMA can provide an affirmative defense if a defendant establishes the existence of a bona fide physician-patient relationship, that the amount of marijuana was an amount reasonably necessary to prevent an interrupted supply, and that the alleged conduct was for medical use. (Walsh Appellant Br. at 24) (citing Mich. Comp. L. § 333.26428). He contends this is a question of fact. *Id*. (citing *Hartwick*, 870 N.W.2d at 56).

7   Both parties asked questions to prospective jurors regarding medical marijuana during voir dire. *See United States v. Guzman*, 450 F.3d 627, 632 (6th Cir. 2006) (discussing the screening function of voir dire and noting that "[p]otential jurors' responses about the outcomes of cases with which they have had personal experience are certainly relevant to the discovery of potential and actual biases"). To the extent that Walsh and Jenkins assert that pursuit of this line of questioning during voir dire constitutes an instance of prosecutorial misconduct, we disagree. We afford the district court wide discretion in voir dire, the primary purpose of which "is to make possible the empanelling of an impartial jury through questions that permit the intelligent exercise of challenges by counsel." *United States v. Blount*, 479 F.2d 650, 651 (6th Cir. 1973).

8   These comments were made by Jenkins's attorney, but joined by Walsh's attorney.

9   Jenkins's motion to suppress her statements also included an incident from April 2014. However, she does not raise this issue on appeal and we consider it waived. *See Priddy v. Edelman*, 883 F.2d 438, 446 (6th Cir. 1989) ("We normally decline to consider issues not raised in the appellant's opening brief.").

10  Jenkins's counsel did not object to the sentence when it was imposed at the sentencing hearing, instead, only confirming that Jenkins did not waive objections previously made at a forfeiture hearing regarding quantity and dollar value attributed to the marijuana.

11  Jenkins's Sentencing Guidelines range was originally calculated at 151 to 188 months, however, the district court sustained Jenkins's objection to an obstruction of justice enhancement under Section 3C1.1. This lowered the applicable Sentencing Guidelines range to 121 to 151 months; Jenkins was sentenced to 126 months imprisonment.