UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| | ) | No. 1:18-cr-166 |
| -v- | ) | |
| | ) | HONORABLE PAUL L. MALONEY |
| DANIEL DARIO TREVINO, | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION

Defendant Daniel Trevino has been charged with various violations of the federal Controlled Substances Act, but he claims that his conduct complied with the Michigan Medical Marijuana Act. He has now moved the Court to quash the indictment because, beginning in 2014, Congress prohibited the Department of Justice from using funds to prevent states from implementing their own laws regarding the use, distribution, possession, or cultivation of marijuana. Trevino thus argues that the government's prosecution of him violates this limitation on expenditures enacted by Congress and, therefore, also violates the Appropriations Clause of the Constitution and asks the Court to "quash" the indictment "unless and until the government establishes the authority" of the DEA and DOJ to expend federal funds to prosecute him.

The Court scheduled a hearing on the motion. First, it took argument on who bears the burden of proving or disproving compliance with the Michigan Medical Marijuana Act. Having heard from both parties, the Court concluded that the defendant bore the burden of proving "strict compliance" with state medical marijuana law and cited the Ninth Circuit

1

opinion of *United States v. McIntosh*, 883 F.3d 1163 (9th Cir. 2016) and Judge Lawson's opinion that, as the party seeking an injunction, the defendant bore the burden of enjoining the prosecution for violation of the Appropriations Clause. *United States v. Bally*, No. 17-20135, 2017 WL 5625896, at *5 (E.D. Mich. Nov. 22, 2017).

The parties were then to proceed to the evidentiary hearing on the motion, and Trevino was to call his first witness. However, Trevino then raised a separate question that appears to be an issue of first impression: If he testified at the evidentiary hearing and was ultimately unsuccessful on his motion, could the United States use his testimony as substantive evidence in its case-in-chief? Of course, the question needed to be resolved before the evidentiary hearing could proceed, so the Court adjourned the hearing and ordered the parties to file supplemental briefs addressing whether Trevino's testimony could be used as substantive and/or impeachment evidence.

Now with the benefit of the parties' briefs, the Court concludes that a defendant's testimony at an evidentiary hearing to enjoin prosecution—based on a Congressional funding prohibition—does not require use immunity, and therefore, any relevant testimony given by Trevino is admissible as substantive evidence in the government's case-in-chief.

## I.

The Court has set forth the facts generally at issue in previous opinions. It suffices to say here that Defendant Daniel Trevino operated a medical marijuana business in Western Michigan beginning in 2011 and continuing through at least 2016. He maintains that his business complied with pertinent Michigan law regarding the use, distribution and transfer of medical marijuana. The federal government disagrees. It charged Trevino and three co-

defendants with various violations of the federal Controlled Substances Act, including conspiracy to manufacture, distribute, and possess with intent to distribute marijuana (Count One), maintaining a drug premises (Counts Two, Six, Seven, Eight), manufacturing marijuana (Counts Three & Five), and possession with intent to distribute marijuana (Counts Four and Nine).

## II.

### A. State and Federal Regulation of Marijuana

The advent and acceptance of medical marijuana among the states has not been matched by the federal government. While thirty or more states have legalized marijuana for medical purposes, the federal government has classified marijuana as a Schedule I controlled substance under the Federal Controlled Substances Act since 1970. Drugs must meet three criteria to be placed in Schedule I: (1) the drug must have a high potential for abuse; (2) the drug must have no currently accepted medical use in treatment; and (3) there is a lack of accepted safety for use of the drug under medical supervision. 21 U.S.C. § 812. "By the terms of the Act, marijuana is 'contraband for any purpose,' and, if there is any conflict between federal and state law with regard to marijuana legislation, federal law shall prevail pursuant to the Supremacy Clause." *United States v. Walsh*, 654 F. App'x 689, 695 (6th Cir. 2016) (quoting *Gonzales v. Raich*, 545 U.S. 1, 14 (2005)).

The conflict between state and federal views of medical marijuana has created new frontiers for traditional issues of constitutional law and kept many legal commentators gainfully employed. *See, e.g., Raich*, 545 U.S. at 16 (holding that Commerce Clause empowered Congress to regulate solely intrastate cultivation of marijuana; *id.* at 57

3

(O'Connor, J., dissenting) ("[W]hatever the wisdom of California's experiment with medical marijuana, the federalism principles that have driven our Commerce Clause cases require that room for experiment be protected in this case."); Robert A. Mikos, *On the Limits of Supremacy: Medical Marijuana and the States' Overlooked Power to Legalize Federal Crime*, 62 VAND. L. REV. 1421, 1456–60 (Oct. 2009) (examining federal supremacy and examining preemption of various state methods of "legalizing" medical marijuana).

**B. Congress Prevents the DOJ from spending funds "to prevent States from implementing" Medical Marijuana Programs**

Congress added a new dimension to the medical marijuana debate in 2014 by imposing a spending limitation on the Department of Justice's funds relating to medical marijuana:

> None of the funds made available in this Act to the Department of Justice may be used, with respect to the States of ... Michigan ... [and 31 other states and the District of Columbia] to prevent such States from implementing their own State laws that authorize the use, distribution, possession, or cultivation of medical marijuana.

Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, § 538, 128 Stat. 2130, 2217 (2014). Congress has enacted an essentially identical rider in the appropriations acts for the years since 2014. *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 542, 129 Stat. 2242, 2332-33 (2015); Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, § 537, 131 Stat. 135, 228 (2016). The rider appears once again in Section 538 in the Consolidated and Further Continuing Appropriations Act of 2018.

4

The Appropriations clause of the U.S. Constitution prohibits the payment of money from the Treasury unless it has been approved by an act of Congress. U.S. CONST. art. I, § 8, cl. 1. Thus, if the Department of Justice spends money in a manner explicitly prohibited by statute—here the prosecution of a criminal action for conduct purportedly in compliance with state law—the Department violates the Appropriations Clause and the maintenance of the criminal action constitutes a violation of the separation of powers.

However, Congress' actions have left uncertain crucial questions, including who may invoke its protection? Some viewed the language as preventing prosecutions only of state officers charged with implementing medical marijuana programs in their official capacity. *United States v. Gouve*, No. 2:14-PO-0157-JTR-1, 2015 WL 417928, at *3 (E.D. Wash. Jan. 30, 2015). Others found that Congress intended to block prosecutions for "conduct sanctioned by state medical marijuana laws." *United States v. Firestack-Harvey*, No. 13-CR-0024-TOR-1, at 5-6 (E.D. Wash. Feb. 12, 2015).

Although the Sixth Circuit has yet to weigh in on the scope of the spending prohibition, the prevailing view appears to be the latter—that Congress intended to block prosecutions of private individuals who were following state medical marijuana law. *See United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016).[1] The *McIntosh* court consolidated

---

[1] Three judges in the Eastern District of Michigan have followed *McIntosh* to varying degrees. *See United States v. Bally*, 17-cr-20135, 2017 WL 5625896 (E.D. Mich. Nov. 22, 2017) (Defendant entitled to evidentiary hearing on compliance with MMMA and bore the burden of proof); *United States v. Ragland*, No. 15-CR-20800, 2017 WL 2728796 at *1 (E.D. Mich. June 26, 2017) (no evidentiary hearing on compliance with state medical marijuana law necessary as the conduct alleged—possession of explosive devices–was unlawful under federal law with or without compliance), *interlocutory appeal dismissed* 2018 WL 3244006 (6th Cir. June 5, 2018) (order); *United States v. Samp*, No. 16-CR-20263, 2017 WL 1164453 at

ten different cases that raised common questions relating to state medical marijuana compliance and the appropriations rider.

The *McIntosh* court construed the rider's language to broadly prohibit the Department of Justice "from spending money on actions that prevent the Medical Marijuana States' giving practical effect to their state laws that authorize the use, distribution, possession, or cultivation of medical marijuana." *Id.* at 1176. Thus, individuals who claimed to be in compliance with state medical marijuana law were empowered by the rider to challenge the federal government's use of funds to prosecute them. *Id.* The court also observed that, historically, federal courts have rarely enjoined federal criminal prosecutions and that, "in almost all federal criminal prosecutions" such injunctive relief would not be appropriate. *Id.* at 1172 (citations omitted). However, the court reasoned that since Congress had enacted a funding restriction to prohibit spending funds on certain activities, the defendants could seek to enjoin the DOJ from spending the funds on their prosecutions—even if they could not obtain an injunction of the prosecution itself. *Id.*

Finally, in a footnote, the *McIntosh* Court explained that it would not decide exactly how district court should resolve the claims at issue, and expressed "no view" on the precise procedures to be followed or the relief required. *Id.* n.2. Accordingly, the court remanded to the district courts and instructed that, if the prosecutions were to continue, the defendants were entitled to evidentiary hearings "to determine whether their conduct was completely authorized by state law . . . mean[ing] that they strictly complied with all relevant conditions

---

*1 (E.D. Mich. Mar. 29, 2017) (defendant entitled to evidentiary hearing but government bore the burden of proof by a preponderance of the evidence).

6

imposed by state law on the use, distribution, possession, and cultivation of medical marijuana." *Id.* at 1179.

**B. Admissibility of Testimony at Hearing on Motion to Quash**

The Court indicated previously that it would follow *McIntosh*, and the evidentiary hearing—described by the parties as a "Section 538 Hearing"—was scheduled for December 19, 2018. At the hearing, the Court heard oral argument on who would bear the burden of proof on the motion. Ultimately, the Court found Judge Lawson's opinion in *Bally* to be persuasive, and thus held that Defendant Trevino, as the moving party, bore the burden on his motion to enjoin his prosecution. As Judge Lawson wrote in distinguishing from *Samp*, the evidentiary hearing was "not a forum for the defendant to present an affirmative defense to the federal charges brought against him." *Bally*, at *5. Nor was the hearing meant to establish guilt or innocence—in which the government would, of course, bear the burden. *Id.* Instead, the hearing was "to determine whether the defendant is entitled to an injunction barring the use of DOJ funds on this prosecution." *Id.* Thus, the general rule that the party seeking an injunction bears the burden applied to the evidentiary hearing. *Id.*

Having clarified the posture of the case, the Court must now address a novel question: Whether Defendant Trevino's testimony at the impending evidentiary hearing can be used against him at trial in the government's case-in-chief. The Court views the matter as an issue of first impression; neither party has directed the Court to a case directly on point, and the Court's independent search was similarly fruitless. But the United States Supreme Court and the lower federal courts have opined on the protections to be afforded to a defendant's

incriminating pre-trial testimony in other situations, and those opinions will guide the court here.

First, as both parties recognize, the starting point is the United States Supreme Court's opinion of *Simmons v. United States*. 390 U.S. 377 (1968). There, police seized a suitcase, which contained evidence of a bank robbery, from the home of a third-party. *Id.* at 380. One of the defendants (Garrett) charged with robbery argued that the seizure of the suitcase was the result of an unlawful search and moved to suppress the evidence. *Id.* at 381. To establish his standing to challenge the search, the defendant testified at the suppression hearing and essentially admitted that it was his suitcase, which incriminated him in the robbery. *Id.* The district court denied the motion to suppress, and the government was then allowed to use the defendant's incriminatory testimony at trial. *Id.*

On appeal, the defendant argued that the testimony should not have been admissible against him because of the tension between his Fourth and Fifth Amendment rights. *Id.* at 388. The Supreme Court agreed with this framing of the issue: "[I]n this case Garrett was obliged to either give up . . . . a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination." *Id.* at 394.

The Court thus rejected the reasoning of the lower courts, which had concluded that there was no violation of the defendant's Fifth Amendment right because the defendant's testimony at the suppression hearing was "voluntary." *Id.* Justice Harlan explained that the testimony may have been voluntarily-given "as an abstract matter," because the defendant could simply have decided not to testify and given up the benefit. *Id.* However, when the benefit to be gained "is that afforded by another provision in the Bill of Rights, an undeniable

tension [was] created." *Id.* In such circumstances, it was "intolerable that one constitutional right should have to be surrendered in order to assert another." In sum, the core holding of *Simmons* is that "when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection." *Id.*

*Simmons* has never been overruled, but just three years later, Justice Harlan wrote a majority opinion critical of his prior opinion in a case involving the constitutionality of Ohio's procedures for capital murder cases. *McGautha v. California*, 402 U.S. 183 (1971). There, one of the petitioners, Crampton, was tried and convicted of murdering his wife in Ohio. *Id.* at 194. Under Ohio law, Crampton's guilt and punishment were adjudicated in a single trial, and Crampton did not testify. *Id.* A jury convicted Crampton and did not recommend mercy, so the trial court issued a judgment imposing the death sentence as was required under Ohio law. *Id.* After Crampton was informed of the verdict, he replied that he felt he had not received a fair and impartial trial and that the jury had been prejudiced by prior bad acts. *Id.* at 195.

On appeal, Crampton asserted that he had a constitutional right not to be compelled to testify as a witness against himself and a constitutional right guaranteed by the Due Process clause to be heard on the issue of punishment. *Id.* at 210–11. He argued that under Ohio's single-trial procedure, he was forced to choose between these constitutional rights, as the Court had concluded was "intolerable" in *Simmons*. *Id.*

The Court disagreed and distinguished *Simmons*, finding that the prior case had involved "a very different situation" which could not be directly applied to Crampton's case.

9

*Id.* at 211. The Court noted the observation in *Simmons* that the federal government's use of the defendant's testimony from an unsuccessful motion to suppress "created an unacceptable risk of deterring the prosecution of marginal Fourth Amendment claims" which would weaken the exclusionary rule and opined that it was an "analytically sufficient basis" for the *Simmons* decision. *Id.*

Justice Harlan then examined the broader reasoning in *Simmons* and found that "the only real basis for holding the Fifth Amendment policies were involved was the colorable Fourth Amendment Claim" that the Court had started with. *Id.* at 212. He then compared what he termed "the insubstantiality of the purely Fifth Amendment interests" involved in *Simmons* with a series of guilty plea cases that the Court had decided in the interim which had upheld waivers of rights under the Fifth, Sixth, and Fourteenth Amendments. *Id.* at 212 (citations omitted).

In Justice Harlan's view, *Simmons* presented a "far-weaker" claim relating to his Fifth Amendment waiver than those presented in the guilty plea cases. In light of this incongruity, he wrote that *Simmons*' result was sound, but that the validity of the reasoning underpinning the result was "open to question" and rejected the expansive view of *Simmons* advocated by Crampton. The Court then turned back to the facts of Crampton's case and admonished that "[t]he criminal process, like the rest of the legal system, is replete with situations requiring 'the making of difficult judgments' as to which course to follow." *Id.* at 213 (quoting *McMann v. Richardson*, 397 U.S. 759, 769 (1970)). Thus, even if a defendant may have a constitutional right to follow a particular course, "the Constitution does not . . . always forbid requiring him to choose." *Id.*

The Court explained that the "threshold question" was whether "compelling the election [of a choice between rights] impairs to an appreciable extent any of the policies behind the rights involved." *Id.* And after examining the policies underpinning the Fifth Amendment right against self-incrimination and the right of a defendant to be heard on punishment, Justice Harlan concluded for the majority that Ohio's single-trial procedure had not violated Crampton's constitutional rights.[2] *Id.* at 217–18.

In the years since *Simmons* and *McGautha*, the lower courts have provided defendants with use immunity in limited circumstances when admitting the testimony would force the defendant to choose between his Fifth and Sixth Amendment rights. For instance, incriminating testimony given at an indigence hearing causes a tension between Fifth and Sixth Amendment rights, such that without the protection of use immunity, defendants were faced with "an illusory and impermissible choice." *United States v. Branker*, 418 F.2d 378, 380 (2d Cir. 1969); *see also United States v. Aguirre*, 605 F.3d 351, 358 n.5 (6th Cir. 2010) (concluding that truthful financial affidavit was improperly admitted by the district court because it required the defendant to choose between his Fifth and Sixth Amendment rights but did not warrant reversal on plain error review).

However, most Circuits have generally declined to extend *Simmons'* protection to purported conflicts between other rights and the Fifth Amendment. *See, e.g., Porretto v. Stalder*, 834 F.2d 461, 465–66 (5th Cir. 1987) (rejecting claim that Louisiana bail statutes for capital offenses compelled defendant to choose between his right against self-incrimination

---

[2] The judgment in Crampton's case upholding the death penalty was later vacated on grounds unrelated to the *Simmons* issue. *See Crampton v. Ohio*, 408 U.S. 941 (1972).

and his Eighth Amendment right to be free from excessive bail—even though the burden was on defendant to show that "the proof is not evident or the presumption is not great that he is guilty of a capital offense[]"–because the statute did not require him to personally testify to satisfy the burden); *United States v. Ingraham*, 832 F.2d 229, 239 (1st Cir. 1987) (declining to apply *Simmons* to testimony made at bail hearing); *United States v. Merrill*, 484 F.2d 168 (8th Cir. 1973) (defendant's testimony at removal hearing admissible at subsequent criminal trial as defendant's decision to testify at removal hearing "entirely one of trial strategy"). *But see United States v. Perry*, 788 F.2d 100, 115–16 (3d Cir. 1986) (concluding that the Bail Reform Act of 1984 was constitutional because, while the defendant's incriminating testimony may have been required to rebut a presumption of dangerousness as required for bail, the defendant would then be entitled to use immunity under *Simmons*); *In re Grand Jury Investigations*, 587 F.2d 589 (3d Cir. 1978) (extending *Simmons* to Speech and Debate privilege invoked by congressman).

Trevino urges the Court to apply *Simmons* and rule that any testimony he gives at the Section 538 hearing is immune from being offered by the government at trial as substantive evidence. He argues that, because individuals have standing to challenge government action that allegedly violates the separation of powers, *Bond v. United States*, 564 U.S. 211 (2011), his right to do so is in "intolerable" tension with his Fifth Amendment right against self-incrimination.[3]

---

[3] In *Bond,* the plaintiff challenged a federal statute who forbid the knowing possession or use, for nonpeaceful purposes, of a chemical that can cause death, temporary incapacitation or permanent harm to humans. 564 U.S. 211. The Supreme Court held that he had prudential standing to challenge the statute on Tenth Amendment/Federalism grounds. *Id.*

The Court is not so persuaded. First, despite Trevino's assumption to the contrary, there is no conflict between the rights alleged. In other words, Trevino's predicament is much more akin to *Porretto* than it is to *Simmons*. While Trevino's testimony is one way in which he could seek to prove compliance, he could also attempt to do so through testimony of other individuals with knowledge of Hydroworld's business practices and the business records of the company itself. Thus, just as the defendant in *Porretto* was not *required* to testify, even though it was his burden to rebut the presumption of a capital offense, Trevino here is not required to testify though it is his burden to show compliance with the Michigan Medical Marijuana Act. In either scenario, the contrast to *Simmons* is evident. There, based on the unusual circumstances leading to the seizure of the Defendant's belongings, the only way he could assert standing to pursue his Fourth Amendment challenge was to testify that the suitcase was his, which amounted to a confession of his participation in the robbery—obviously waiving his Fifth Amendment right.

Second, the Court is unaware of any other court which has expanded the *Simmons* right beyond a personal constitutional right guaranteed by the Bill of Rights. While some commentators have been critical of making rights guaranteed by the Bill of Rights the dividing line for use immunity, William R. Stein, *Resolving Tensions Between Constitutional Rights: Use Immunity in Concurrent or Related Proceedings*, 76 COLUM. L. REV. 674, 686 (May 1976), *McGautha* made clear that the Supreme Court was merely open to reconsidering its analysis in *Simmons*. It has never gone further in repudiating *Simmons*' conclusion that use

---

at 225-26. Here, Trevino challenges executive action rather than legislative action and asserts the Appropriations clause rather than the Tenth Amendment.

immunity ought to be afforded to a defendant when the defendant's Fifth Amendment right against self-incrimination is in intolerable tension with a "benefit . . . *afforded by another provision in the Bill of Rights.*" *McGautha*, 402 U.S. at 212, (quoting *Simmons*, 390 U.S. at 393–94 (1967) (emphasis added)). In light of that conclusion, the Court will not extend *Simmons* to allow Trevino use immunity to enforce the statutory spending restrictions imposed on the DOJ by Congress pursuant to Article I of the Constitution. A constitutional right of the defendant emanating from the Bill of Rights is simply not implicated by Trevino's motion.

### III.

In conclusion, Defendant Daniel Trevino has Article III standing to pursue an injunction of his criminal prosecution on a theory that the Department of Justice has violated Section 538. However, simply because Trevino has standing, it does not mean that there exists an "intolerable tension" between Trevino's right against self-incrimination and his right to challenge government action under the Appropriations Clause. For the reasons explained, the Court holds that Trevino is not entitled to use immunity for testimony given at a Section 538 hearing.

Date: January 16, 2019 /s/ Paul L. Maloney
Paul L. Maloney
United States District Judge