UNITED STATES OF AMERICA

IN THE WESTERN DISTRICT OF MICHIGAN

United States of America,　　　　　　　　　　　File No. 1:18-cr-166
　　　Plaintiff,

　　　v.　　　　　　　　　　　　　　　　　　　Hon. Paul L. Maloney
　　　　　　　　　　　　　　　　　　　　　　　U.S. District Court Judge

Daniel Dario Trevino (D-1),
　　　Defendant.
_____/

**BRIEF IN SUPPORT OF DEFENDANT DANIEL TREVINO'S (D-1) MOTION TO DISMISS FOR FIRST AMENDMENT AND FOURTEENTH AMENDMENT VIOLATIONS**

Attachment 1 – Licensing and Regulatory Affairs Memo

# Ramsdell, Rae H

| From: | Hilfinger, Steven (LARA) |
|---|---|
| Sent: | Wednesday, June 29, 2011 10:15 AM |
| To: | Edgerton, Shelly J (LARA); Ramsdell, Rae H |
| Cc: | Zimmer, Mike (DELEG); Burton, Diane (LARA) |
| Subject: | Medical Marihuana |
| Attachments: | Medical Marihuana Memo.pdf |

Saw the MMMA articles today, and heard about the AG's announcements/news conference on radio yesterday. I would like to receive a copy of the bills and any accompanying background, and the A.G. opinion 7259 on the growing co-ops.

I would like LARA to have an active voice in MMMA legislation, regulations and policy development. We have to administer it, after all. Let's get that call set up with the Rand guy over the next couple weeks, and sit down before then and evaluate where things stand. Brian DeBano's policy writeup of MMMA is attached again, for your reference, if helpful.

Thanks in advance.

Steve
Steven H. Hilfinger
Director and Chief Regulatory Officer
Michigan Department of Licensing and Regulatory Affairs
Phone: (517) 373-6334
Fax: (517) 373-2129
hilfingers@michigan.gov
www.michigan.gov/lara

LICENSING AND REGULATORY AFFAIRS
CUSTOMER DRIVEN. BUSINESS MINDED.

6/29/2011

RICK SNYDER  
GOVERNOR



STATE OF MICHIGAN  
DEPARTMENT OF ENERGY, LABOR & ECONOMIC GROWTH  
LANSING

STEVEN H. HILFINGER  
DIRECTOR

# MEMORANDUM

**TO:** Steven H. Hilfinger, Director

**FROM:** Brian DeBano, Deputy Director

**RE:** Medical Marihuana

**DATE:** March 31, 2011

---

## Issue

The Michigan Medical Marihuana Act was adopted by voters in 2008. Since that time the Michigan Department of Community Health (DCH) adopted rules to implement the act. Many believe that what has occurred in the past few years is not what the voters intended when the act was adopted. That it has expanded beyond the "medical use" that most people envisioned. They argue that the proliferation of certain activities, allowed under the rules and the act, need to be curtailed and brought under more control. The Legislature and the Attorney General are both pushing to do something relatively quickly on the issue. In the legislature Senator Rick Jones currently has a work group developing legislation. There are also ways administratively to bring the scope of the act back to what the voters intended. Administration of the Michigan Medical Marihuana Act moves to the Department of Licensing and Regulatory Affairs (DLARA) on April 25, 2011 under Executive Order 2011-4.

## Background

The Michigan Medical Marihuana Act was adopted by voters in November 2008 garnering over 62 percent of the vote. It was not an amendment to the Michigan Constitution; it was an initiated law under Article II, Section 9 of Michigan's Constitution. As such the law was drafted solely by advocates of the proposal. As a law initiated under Article II, Section 9 can only be amended by a 3/4 vote of the members of the House and Senate.

The law required that the DCH administer the program. It required the department to promulgate rules to implement the act within 120 days of the effective date of the act (December 4, 2008). This set up a very tight timeline for the Department to act. Also, given that the proposal had just been overwhelming approved by voters DCH was reluctant to stretch the rules too far or make them too restrictive fearing a backlash from the public and vocal advocates of the law. It also appears that DCH did not have the support of the prior administration or prior Attorney General

DELEG is an equal opportunity employer/program.  
Auxiliary aids, services and other reasonable accommodations are available upon request to individuals with disabilities.

611 W. Ottawa • P.O. BOX 30004 • LANSING, MICHIGAN 48909 • www.michigan.gov • (517) 373-1820

in drafting restrictive rules. As a result the rules that were adopted are by and large the law itself put into rule.

In general the law creates two groups to be licensed: Qualifying patient and primary caregiver. The qualifying patient may get a registry identification card by submitting an application along with a written certification (not a prescription) from a doctor stating the patient's debilitating medical condition (very broad including "chronic pain") and that the patient would benefit from the medical use of marihuana. The qualifying patient may designate a primary caregiver to assist with their treatment or if they don't designate one the patient is allowed to cultivate up to 12 marihuana plants themselves. A registry identification card is also issued to any primary caregiver designated by the patient. Each caregiver can only provide treatment to a maximum of 5 patients and can grow 12 plants per patient they care for. Caregivers can be compensated for the costs associated with assisting a registered patient with the use of medical marihuana. There is a $100 fee for each new or renewal patient application; however, this is reduced to $25 if the patient is on Medicaid or the recipient of Supplemental Security Income benefits (SSI). Under the law these fees are and were set by rule.

## Problems and concerns since implementation

There have been many problems and concerns since DCH began implementing the program.

1) Shear volume of patients – Since the implementation of the act DCH has received 113,493 patient applications and receives about 500 new applications a day. There are currently 63,869 active patients and 24,976 registered caregivers. DCH is processing these with 9 permanent and 9 temporary positions. However, the backlog continues to grow. For example in February 9,833 applications were received but only 4,723 were processed. The major problem with this is that under the act DCH is given only 15 days to approve or deny an application. If they do not, than an application more than 15 days old is deemed to be proof that the patient is valid. There are multiple solutions to this problem ranging from hiring additional employees to contracting out the processing of the applications. In fact the legislature adopted budget boilerplate last year requiring DCH to contract out this service. However, an Attorney General opinion found that DCH could not do that without first changing the rules.

2) Denial of corporate status – The Department of Energy Labor and Economic Growth (DELEG) is currently in litigation based on its refusal to accept the filing of proposed articles of incorporation submitted by Helping Hands Cannabis Center as a nonprofit. The rejection is based on a corporate purpose of "medical marijuana services" and since there is no statutory authority permitting a corporation to grow, sell or distribute marihuana the purpose was deemed unlawful and therefore rejected. The Department has rejected other corporate filings for corporations with similar purposes. The case is currently pending in Ingham County Circuit Court.

3) Doctor-patient relationship – The law provides that no physician can be sanctioned or disciplined for providing the required certifications in the course of a "bona fide

physician-patient relationship" and they can be sanctioned if the violate the "standard of care for evaluating medical conditions." However, anecdotally the process for getting a certification to become a patient is hardly complicated. The stories range from doctors reviewing and signing applications without even seeing the patient to doctors signing forms that are later sold without ever knowing the patient that will eventually get the certification. You can also currently go on the internet, answer a few questions and get a certification. Doctors are often paid between $150 and $200 per certification they sign. In fact, DCH reports that 55 physicians account for 71% of certifications issued. Doctors are currently not at all concerned about losing their medical license by handing these certifications out.

DCH is currently working with the Michigan State Medical Society (MSMS) on defining "bona fide physician-patient relationship" not just for this issue but for other wide spread use. This is also an area that is being explored by the legislature as this definition could be added to the Public Health Code which would require only a majority vote in the legislature. The definition could include such things as requiring and keeping records of physical exams. You could also use this method to prevent someone from getting a certificate online or by telephone.

4) Employment issues – Since positive tests for marihuana use long outlast the "effects" of marihuana this has create some employment issues. Most notably and recently Wal-Mart won a U.S. District Court case where they fired an employee who was a registered marihuana patent. The patient tested positive but claimed that he never went to work high. The judge ruled that the law "says nothing about private employment rights. Nowhere does the [law] state that the statute regulates private employment, that private employees are protected from disciplinary action should they use medical marihuana, or that private employers must accommodate the use of medical marihuana outside of the workplace."

Related to this is how employment termination due to testing positive for marihuana affects yours unemployment benefits in Michigan. In April, 2010 the Michigan Unemployment Insurance Agency used a "Benefit Interpretation" in their "Manual of Precedents" that says a claimant should not be disqualified for benefits if they were fired solely for testing positive for marihuana and if they had a Michigan Medical Marihuana registry identification card.

5) Housing issues – Similar to the employment issues there is growing concern from landlords about what they can and cannot prohibit on their property and whether this needs to be specifically included in leases.

6) Law enforcement concerns – Law enforcement has never been a supporter of the law. However, they do offer some valid concerns:

   a. The lack of a photo on the registry identification card makes it very difficult for them to determine if the person carrying the card is the patient.

b. The inability to search by name in the registry. While they can look up a registry identification number to see if it is valid, if someone doesn't have their registry card with them they cannot look up a name to see if you are in the registry.
c. There is concern that replacements for lost or stolen registration cards are not giving different identification numbers and that old numbers are canceled in the system.
d. There is no age restriction in the Act. Currently under the Act those under age 18 need parental consent and certification from two physicians. Some believe that there should be a hard minimum age of 21 years old.
e. The proliferation of "dispensaries". The law says nothing about dispensaries yet these are growing in number across the state under the premises that not all patients or caregivers have ability to grow their own medicine and proponents argue that since the law is silent on this fact they are allowed. They fear these are serving a just a front for illegal drug trafficking.
f. Poor record keeping of sales volume. While the law allows patients to be in possession of 2.5 ounces of medical marihuana it doesn't limit the number of visits they can make to their caregiver to get this amount. The allegation is they are reselling it for a profit. While it is illegal for a patient or caregiver to sell to anyone who is not on the registry under the act, this is very difficult to monitor. They argue tracking purchase volume would be one such tool.

## Options

1) Leave the law and rules alone and increase the number of staff to take care of the backlog of applications. In the first 6 months of Fiscal Year 2011 the program generated over $4.3 million. The Bureau of Health Professionals estimates that they need an additional 6 to 8 employees to handle issuance of the cards at its current pace and clearly they are generating enough revenue to pay for this staff increase.

2) Leave the law and rules alone and hire a private contractor to issue the cards. As mentioned earlier an Attorney General Opinion (#7250) issued in 2010 stated that the way the current rules are drafted DCH cannot contract out this process. The rule was drafted so that only "authorized employees of the department" may have access confidential information that would be needed to process the applications. This could be changed to include those authorized by the department. This would allow a vendor can process the applications, do the proper verifications and at the end issue the cards However, the Opinion points out that DCH cannot delegate its discretionary authority as to making a final determination of who gets cards.

3) Ask for an Attorney General Opinion on a number of outstanding questions regarding the legal scope of the Medical Marihuana Act. This might be a logical step before revising the rules. DLARA could ask the Attorney General for help narrowing in the broad definitions under the Medical Marihuana Act. It might also be useful on the issue of "dispensaries" and other ancillary issues.

4) Revise the rule set to bring it more in line with the intent of the voters and close "loop holes". The Department of Community Health was under a short timeline to get the initial rules promulgated. Now that they are in place and have been for a couple of years it might be prudent to review the rules and suggest some changes. Safeguards could be put in place such as:

   a. Social Security # verification of patients. We currently require the number on the applications but don't verify them.
   b. Require photos on the registry cards or require card holders to have a state issued driver's license or personal identification card.
   c. Require applicants come in person to apply for a registry card and provide proper and verifiable identification.
   d. Create an online system for caregivers where they much update the names of their limited 5 patients and keep track of disbursements of marihuana.
   e. Define a bona fide physician-patient relationship.

5) Revise the law. As was mentioned earlier it requires a 3/4 vote of the legislature to amend a voter initiated law. While both chambers have a fairly large Republican majority this is an issue that isn't always a partisan issue. Many Republicans lean "libertarian" in nature and if they aligned with "civil libertarian" Democrats any change to the initiated law would be very difficult.

   The definition of a "bona fide physician-patient relationship" is something that the legislature could deal with as it is in the Public Health Code, which only takes a majority vote to amend. It appears from legislative work group meetings that MSMS and DCH are close to agreeing on a definition. Required follow up visits with doctors could also be addressed in the Public Health Code.

6) Form a "Blue Ribbon Commission". Last year State Representative Fred Durhal (D-Detroit) had multiple work group meetings on the issue. While both sides (law enforcement and advocates) attended the meetings it appears that the advocates attended more often. One suggestion that came out of the work groups was for the Governor to form a commission made up of various constituencies with an interest in the issue and charge them, on a limited time line, to make recommendations for the Governor as far as rule and legislation changes.

7) Let the courts deal with it. This will happen no matter what option above is chosen. Attorney General Bill Schuette is actively getting involved with litigation on the issue, filing amicus briefs in many cases. Some deal with the specific employer, landlord and corporate filing issues discussed above. Others have involved dispensaries and local zoning. Still others are broader such as a recent Dearborn District Court case where the Judge ruled the law unconstitutional under the U.S. Constitution's Supremacy Clause. While that decision isn't binding on anyone other than the parties involved, if appealed it could have a much bigger impact.

### Recommendation

I believe we need to go down the path of revising the rules and bringing them more into line with the voter's intent. I would recommend we start by drafting an Attorney General Opinion request to help us understand the legal scope of the Medical Marihuana Act. Once we get an answer to our request we would begin the process of revising the rules. In the mean time I think we should hire some additional limited term (1 year) staff, or look for existing resources in DLARA, to deal with the backlog of applications. As much as I agree that this should be contracted out we can't do that right now given the current rules that are in place. Finally, I think we need to convince the legislature to let us move forward along these lines before they push for legislation that will "muddy" the issue and likely not be successful in getting passed in the end. However, if they insist on doing something legislatively, suggest they work on the definition of "bona fide physician-patient relationship" in the Public Health Code, since this could likely be done faster than the rule making process.